Edwin C. WEST, Dennis Thiel, Matthew Bennett, Robert Addington and Perry Bernal, Plaintiffs,

v.

Phil MACHT, Byran Bartow, Colleen Collier, Mario Canziani, Kurt Schwebke, Juanita Echeverria, Virginia Wojdac, Scott Trippe, Mark Christian and Mary Enders–Muraski, Defendants.

No. 99–C–0147.

United States District Court, E.D. Wisconsin.

Dec. 3, 2002.

Patrick T. Berigan, (Wis. Coalition for Advocacy), for Plaintiffs.

Jody J. Schmelzer, (Wis. Dept. of Justice), for Defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiffs, past and current patients at the Wisconsin Resource Center ("WRC"), bring this action under 42 U.S.C. § 1983 alleging that defendants, WRC staff, violated their constitutional rights. Plaintiffs also allege that defendants violated their rights under the state patients' rights law, Wis. Stat. § 51.61. I have jurisdiction over plaintiffs' federal claims based on 28 U.S.C. § 1331 and have supplemental jurisdiction over the state law claims based on 28 U.S.C. § 1367(a). Before me now are defendants' motions for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs West, Thiel, Bennett and Addington were civilly committed to the custody of the Wisconsin Department of Health and Family Services as sexually violent persons, pursuant to Chapter 980 of the Wisconsin Statutes. Bernal was detained but not committed under Chapter 980.

At all relevant times defendants were WRC employees. Defendant Macht was the Director of WRC until January 2000 when defendant Bartow succeeded him. Defendant Canziani was the WRC Security Director. Defendant Collier was a client rights specialist. Defendants Schwebke, Echevarria, Wojdac, Trippe, Christian and Enders–Muraski were staff psychologists.

WRC is a state correctional institution and also was the treatment facility for Chapter 980 patients. In June 2001, the State opened a new treatment facility for persons detained or committed under Chapter 980, the Sand Ridge Secure Treatment Center ("Sand Ridge").

Plaintiffs' Third Amended Complaint contains six counts and involves three claims: (1) that defendants violated their rights to substantive due process of law (Count I) and their rights under state law (Count IV) by subjecting them to extended periods of seclusion and restraint; (2) that defendants violated their rights under the First Amendment (Count II) and state law (Count V) by intrusive surveillance of their mail; and (3) that defendants violated their constitutional rights of access to the courts (Count III) and their rights under state law (Count VI) by restricting their use of WRC's legal facilities. Plaintiffs seek monetary damages and injunctive and declaratory relief.

Plaintiffs West, Bennett, Addington and Bernal allege that they were unlawfully subjected to extended periods of seclusion, often lasting for weeks and sometimes for more than a month. Some of the seclusion was ordered by administrative staff, but most of it was carried out pursuant to Secure Management Plans ("SMPs"), created and implemented by treatment teams consisting of the psychologist defendants and others.

Seclusion consisted of isolation in a segregation cell on a special unit with little or no personal property. The cell contained only a concrete bed, sink, toilet and a window. At times plaintiffs were placed in cells while completely naked and, on at least one occasion, the cell had no toilet,

and the patient was given a plastic bag in which to relieve himself. During the first phase of the plans, plaintiffs were allowed out of their cells for one hour on weekdays and not at all on weekends. In the higher phases, plaintiffs were allowed out for two hours on weekdays. During the hour or two that they were out of their cells, plaintiffs were placed in physical restraints.

Plaintiffs allege that they were subjected to a number of extended periods of seclusion. One of Bennett's seclusion placements lasted for eighty-two days, and one of Bernal's lasted fifty-five days. In 1998, Bennett and Bernal each spent over one hundred days in seclusion. Addington and West were subjected to periods of seclusion lasting as long as twenty days at a time.

Plaintiffs West, Thiel and Addington challenge the WRC's policy of screening patient mail, pursuant to which they were required to open and shake out the contents of their mail in front of staff.

Plaintiffs West, Thiel and Addington also allege that defendants violated their constitutional right of access to courts. They claim that they were provided with insufficient access to legal resources such as, for example, not being given adequate time or training on Westlaw, a computerized legal research resource available at the WRC. Plaintiffs West, Thiel, Bennett, Addington and Bernal also assert a state law claim of denial of access to courts based on the same allegations and an allegation that such right of access was chilled by a memorandum written by Macht.

Since the commencement of this lawsuit, all plaintiffs except Bernal have been transferred to Sand Ridge, which has different policies than the WRC.

Additional facts will be stated in the course of this decision.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis deleted). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.* at 325, 106 S.Ct. 2548. Once the moving party's initial burden is met, the nonmoving party

must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

Defendants base their summary judgment motions on a number of grounds including mootness, Eleventh Amendment immunity, the lack of sufficient personal involvement on the part of defendant Collier to support a § 1983 claim, plaintiffs' failure to satisfy the requirements of the state notice of claim law, and the failure of some of plaintiffs' claims on the merits. I now address defendants' motions.

## III. MOOTNESS

■■■■ Defendants contend that the requests of plaintiffs West, Thiel, Bennett and Addington for injunctive and declaratory relief are moot because they have been transferred to Sand Ridge. A case may become moot if, during the course of litigation, the plaintiff loses his personal stake in the outcome. *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477–78, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). When prison inmates challenge prison practices, their equitable claims are moot after they are moved to other prisons that do not apply those practices. *Stewart v. McGin-*

*nis,* 5 F.3d 1031, 1038 (7th Cir.1993); *Martin v. Davies,* 917 F.2d 336, 339 (7th Cir. 1990); *see also Fuller v. Dillon,* 236 F.3d 876, 883 (7th Cir.2001) (finding plaintiff prisoner's equitable relief claims challenging prison policies moot after he had been transferred); *Henderson v. Sheahan,* 196 F.3d 839, 849 n. 3 (7th Cir.1999) (same); *Higgason v. Farley,* 83 F.3d 807, 811 (7th Cir.1996) (after transfer prisoner's request for equitable relief is moot unless prisoner can demonstrate that he is likely to be retransferred).

Plaintiffs West, Thiel, Bennett and Addington have been transferred to Sand Ridge, and do not allege that they are likely to be returned to the WRC. Therefore, their requests for equitable relief are moot. Because Counts II and III involve only requests for equitable relief by plaintiffs who have been transferred, Counts II and III must be dismissed in their entirety.

## IV. ELEVENTH AMENDMENT IMMUNITY

■■■■ The Eleventh Amendment bars suits in federal court for money damages against unconsenting states. A suit against a state official in his or her official capacity is a suit against the official's office. Such a suit is no different than a suit against the state itself. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Additionally, the Eleventh Amendment bars claims brought in federal court against a state official in his or her official capacity for violations of state law regardless of the relief sought. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106–21, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

In the present case, many of plaintiffs' claims are brought against defendants in both their individual and official capacities, and some are brought against defendants

only in their official capacities. Based on the rules established in *Will* and *Pennhurst*, plaintiffs' official capacity federal claims seeking money damages and all of their official capacity state law claims must be dismissed. In Count V, plaintiffs assert only a state law claim and name defendants only in their official capacities, thus Count V must be dismissed in its entirety. Further, defendant Bartow is named in the Complaint only in his official capacity, thus, all claims against him will be dismissed.

## V. SECTION 1983 CLAIM AGAINST COLLIER

 Defendants argue that plaintiffs' § 1983 claim against defendant Collier must be dismissed based on her lack of direct personal involvement. Before liability will attach under § 1983, a defendant must be personally involved in the claimed deprivation of constitutional rights. *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983). To have the requisite degree of involvement to be liable under § 1983 a defendant must have participated in the violation, directed others to commit it or with supervisory authority had knowledge of and acquiesced in the violations. *Baker v. Monroe Township*, 50 F.3d 1186, 1190–91 (3d Cir.1995). Defendant Collier was a client rights facilitator who was not personally involved in developing the SMPs and not authorized to make decisions regarding plaintiffs' seclusion. The most that can be said of Collier's involvement is that she communicated the seclusion policy to plaintiff West. This is insufficient to satisfy the requirement of direct personal involvement. Therefore, the § 1983 claim asserted against her in Count I will be dismissed.

## VI. NOTICE OF CLAIM

 Defendants also argue that some of plaintiffs' state law claims are barred because plaintiffs failed to comply with Wis. Stat. § 893.82, which requires a claimant who intends to sue a state employee to serve on the attorney general a sworn and verified notice of claim within 120 days of the event causing the injury (180 days for medical malpractice claims). Wis. Stat. §§ 893.82(3), (5) and (5m). Wisconsin courts have interpreted the requirements of the notice of claim statute strictly, *see e.g., Riccitelli v. Broekhuizen*, 227 Wis.2d 100, 116, 595 N.W.2d 392 (1999) (holding substantial compliance insufficient).

Plaintiffs concede that many of their notices were defective, including all of the notices relating to Count VI claims, none of which were notarized. Thus, Count VI must be dismissed in its entirety.

Further, none of plaintiffs' Count IV notices name defendant Canziani, thus, the Count IV claims against him must be dismissed. Of plaintiffs' Count IV notices, the only one filed within 120 days and otherwise not defective was West's March 12, 1998 notice relating to Collier, Schwebke and Macht, thus the claims described in this notice may proceed. However, some of plaintiffs' count IV notices were filed within 180 days, and plaintiffs argue that such notices were timely because the claims noticed were medical malpractice claims. Defendants disagree. They argue that plaintiffs' Count IV claims against the psychologist defendants are not medical malpractice claims, and that, even if they were, the notice of claim period for all suits brought under the patients' rights law, even those for medical malpractice, is 120 days.

In determining whether plaintiffs' Count IV claims against the psychologist defendants are for medical malpractice and, if so, what notice of claim period applies, I look to state law. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 636–37 (7th Cir.2002). In applying state law I am bound by decisions of the Wisconsin Su-

preme Court, and if there is no decision on point I must predict what the court would do if faced with the question. *Id.*

■ Wis. Stat. § 893.55(1) provides that a malpractice suit is one against a "health care provider." The state supreme court has held that a health care provider is "anyone who professionally provides health care to others." *Clark v. Erdmann*, 161 Wis.2d 428, 438–39, 468 N.W.2d 18 (1991); *see also Doe v. Am. Nat'l Red Cross*, 176 Wis.2d 610, 616–17, 500 N.W.2d 264 (1993). In the present case, the psychologist defendants were professionally providing health care to plaintiffs. Plaintiffs were patients, and the psychologist defendants were treating them. Further, under state law, the psychologist defendants were qualified to provide health care to plaintiffs. *See* Wis. Stat. § 455.02(2m)(m) (exempting certain state employed psychologists providing psychological services from state licensing requirement). Thus, the psychologist defendants were health care providers, and plaintiffs' Count IV claims against them are medical malpractice claims.

■ Medical malpractice suits may be brought under the state patients' rights law, *Wright v. Mercy Hosp. of Janesville, Wis., Inc.*, 206 Wis.2d 449, 468–69, 557 N.W.2d 846 (Ct.App.1996), but the state supreme court has not addressed whether the notice of claim period is the same in such cases as in other medical malpractice suits against state employees. Thus I must predict what it would do if faced with the question. *Allstate Ins. Co.*, 285 F.3d at 636–37. However, the issue does not appear to be a difficult one. The legislature has made clear that the notice of claim period is longer in medical malpractice cases than in others. The reason for the longer notice period is, presumably, to allow a patient adequate time to discover the injury, obtain health care records and perhaps seek a professional opinion on the adequacy of the treatment. This reasoning is no less applicable to malpractice suits brought under the patients' rights law than it is to other malpractice suits. Thus, there is no reason to believe that the state supreme court would decide that a different notice of claim period applies in malpractice actions brought under the patients' rights law than in other malpractice suits against state employees. Under § 893.82(5m), the notice of claim period in the latter category of cases is 180 days. Thus, the notice of claim period with respect to plaintiffs' Count IV claims against the psychologist defendants is 180 days.

Therefore, Addington's claim noticed January 19, 2000 against Trippe; Bennett's claims noticed June 12, 1998, and June 30, 1998 against Wojdac and Schwebke; and Bernal's claims noticed on April 9, 1999 against Schwebke, Trippe, Wojdac, Christian, Echeverria and Enders–Muraski, will survive defendants' motion for summary judgment.

■ The parties dispute whether Bennett's April 27, 1999 notice of Count IV claims against Trippe, Wojdac, Christian, Echeverria and Enders–Muraski was adequate. In parts of his notice, Bennett challenged seclusion placements "beginning on August 7, 1998 and continuing through October 27, 1998," (Kruse Aff. Ex. B at 1), and in other parts he added the words "and possibly beyond." (*Id.*) Bennett states that his seclusion lasted until November 6, 1998 and argues that the words "and possibly beyond" should be construed as encompassing the time between October 27, 1998 and November 6, 1998, when he was transferred to the custody of the Department of Corrections. I agree. The words, "October 27 and possibly beyond," were sufficient to put defendants on notice that plaintiff was challenging a seclusion lasting at least a short time after October 27. The purpose of the no-

tice of claim statute is to enable governmental units to investigate claims against employees, to avoid needless litigation, and to settle all reasonable claims. *Riccitelli,* 227 Wis.2d at 116, 595 N.W.2d 392. Bennett's notice was specific enough to enable defendants to do these things. Thus, Bennett's Count IV claims noticed on April 27, 1999 may proceed.

## VII. SUBSTANTIVE DUE PROCESS

■■■■■ Plaintiffs' only remaining federal claims are their Count I claims for money damages based on their allegations that defendants' policies of seclusion and restraint violated substantive due process. The due process clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). When a state deprives a person of his ability to care for himself by committing him involuntarily, it assumes an obligation to provide some minimum level of well-being and safety. *See DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 198–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

In *Youngberg v. Romeo,* 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that under the due process clause of the Fourteenth Amendment, an institutionalized person in state custody "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." Relying on *Youngberg,* plaintiffs contend that the WRC's use of SMPs that utilized extended periods of seclusion and restraint violated their substantive due process liberty interests, specifically their right to freedom from bodily restraint. In *Youngberg,* the Court observed that " '[l]iberty from bodily restraint always has been rec-

ognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.' " *Id.* at 316, 102 S.Ct. 2452 (quoting *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 18, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (Powell, J., concurring in part and dissenting in part)).

■■■■ Nevertheless, while an individual committed involuntarily to a mental institution is entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," *id.* at 322, 102 S.Ct. 2452, his right to freedom of bodily movement is not absolute. "In operating [a mental health institution], there are occasions in which it is necessary for the State to restrain the movement of residents—for example, to protect them as well as others from violence." *Id.* at 320, 102 S.Ct. 2452. Under a substantive due process analysis, the question "is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint ... is such as to violate due process." *Id.* In determining whether a substantive due process right has been violated, courts must balance "the liberty of the individual and the demands of organized society," by weighing "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.* (citations omitted). The Court held that the "professional judgment" standard was the appropriate test for balancing these interests. *Id.* at 322, 102 S.Ct. 2452.

Plaintiffs challenge two types of seclusion placements—placements ordered by WRC administrators for security reasons, and treatment-related seclusion placements ordered by WRC psychologists. I address each category of placement separately.

## A. Security–Related Administrative Seclusion Placements

 On August 7, 1998, defendant administrators Macht and Canziani ordered that plaintiffs Bennett and Bernal be placed in seclusion. These placements were not based on treatment plans, but on Macht and Canziani's concerns that Bennett and Bernal posed a threat to the institution, its staff and other patients. Pursuant to the administrators' orders, Bennett's placement lasted until August 11 and Bernal's until August 24. Plaintiffs argue that these placements violated substantive due process because they were not made by professionals as defined by *Youngberg*, and because they were unduly restrictive. However, the *Youngberg* professional judgment standard is not the test by which the actions of non-treatment providers are measured. *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir.1998) (professional judgment standard applies only to decisions made by professionals such as physicians, psychiatrists, and nurses within their area of professional expertise). Thus, I must determine what standard to apply to the seclusion placements ordered by Macht and Canziani.

In *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court addressed the conditions of confinement of pretrial detainees and held that, although such detainees could not be punished, their liberty could be restricted if the restrictions were reasonably related to legitimate government objectives and not tantamount to punishment. In a recent case involving a substantive due process challenge by patients under civil commitment to non-treatment related institutional practices, the district court applied the *Bell* standard. *Thielman v. Leean*, 140 F.Supp.2d 982, 991–92 (W.D.Wis.2001). On appeal, the Seventh Circuit seemed to imply in a footnote that *Bell* was the appropriate standard for analyzing such challenges. *Thielman v. Leean*, 282 F.3d 478, 484 n. 3 (7th Cir. 2002). Although there are differences between pretrial detainees and persons under civil commitment, the *Bell* standard does address the kind and degree of restraint that the government may impose on an individual's liberty in a non-therapeutic, yet non-punitive context. Therefore, in the absence of more definitive guidance from the Supreme Court or Seventh Circuit, I will apply the *Bell* standard to the seclusion placements imposed by WRC administrators.

In order to distinguish between an impermissible punitive measure and a permissible condition of confinement, I must decide "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538, 99 S.Ct. 1861. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* (citations and internal quotations omitted).

In the present case, defendants Macht and Canziani state that Bennett was placed in seclusion because he was involved in an attempt by patients to disrupt a unit of the WRC, in the course of which staff members were assaulted. Plaintiffs characterize the action as a "sit-in." (Pl.'s Br. at 25.) Defendants justify the placement based on their concerns about institutional security. The evidence indicates that defendants' concerns were warranted. Thus, I conclude that Bennett's August 7 to August 11 seclusion was rationally related to the purpose of maintaining institu-

tional security and cannot be reasonably characterized as punitive.

Defendants argue that Bernal's placement was justified for the same reason. In Bernal's case the justification is more tenuous because he was not involved in the disruptive action, and because his seclusion lasted until August 24. However, defendants cite evidence that Bernal had a history of being involved in uprisings, that he had threatened to stab another patient, had assaulted a staff member several months previous and was suspected of gang affiliations. Although a closer call, I conclude that defendants' evidence is sufficient to demonstrate that Bernal's August 7–24 seclusion placement was related to legitimate concerns about institutional security.

Thus, Macht's and Canziani's motions for summary judgment with respect to Bennett's and Bernal's claims that their administrative seclusion placements violated substantive due process will be granted.[1]

## B. Treatment–Related Seclusion Placements

### 1. Were Psychologist–Defendants Professionals?

Plaintiffs challenge their treatment-related seclusion placements on several grounds. First, they argue that, under *Youngberg,* only physicians, licensed psychologists and licensed independent practitioners may make treatment decisions, not unlicensed state-employed psychologists, such as defendants. However, *Youngberg* defined the term "professional" relatively broadly:

By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

457 U.S. at 323 n. 30, 102 S.Ct. 2452.

In the present case, all of the psychologist defendants had masters degrees, and some doctorates, in relevant fields. These educational credentials alone qualify them as professionals under *Youngberg.* Therefore, plaintiffs' argument that the psychologist defendants lacked the qualifications required by *Youngberg* to make treatment decisions involving seclusion placements will be rejected.

### 2. Did Psychologist–Defendants Violate the Professional Judgment Standard?

Plaintiffs argue that the extended periods of treatment-related seclusion and restraint to which they were subjected violated substantive due process. Under *Youngberg,* treatment decisions made by professionals are presumptively valid and entitled to deference. *Id.* at 323, 102 S.Ct. 2452. However, professionals may be found to have violated substantive due process when a treatment decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person respon-

---

**1.** Bennett's and Bernal's seclusion placements lasted beyond August 11 and August 24 respectively. However, defendants justify the placements after those dates based on the patients' treatment needs rather than security concerns. I address the issues raised by this argument in the next section of this decision.

sible actually did not base his decision on such a judgment." *Id.*

### a. Summary of Plaintiffs' Arguments and Evidence

Plaintiffs contend that the decisions relating to their treatment constituted such a substantial departure from accepted professional norms that they were not actually based on professional judgment. In support of this argument, plaintiffs present the testimony of psychiatrists Kenneth Tardiff and Jeffrey Metzner, both of whom state that there are accepted professional standards and practices relating to the use of seclusion and restraint for civilly committed patients. Dr. Tardiff states that he is the past-Chairman of the American Psychiatric Association Task Force on the psychiatric uses of seclusion and restraint, and that in 1985 the Task Force published standards applicable to these practices. Dr. Tardiff states that the standards endorsed by the Task Force represent accepted professional judgment, practices and standards concerning the use of seclusion and restraint as treatment tools. He explains that the standards were crafted with the *Youngberg* decision in mind. In support of the contention that there are widely accepted standards that represent professional judgment on this issue, plaintiffs' experts state that the same or largely similar standards as those contained in the APA Task Force Report have been incorporated into the statutes of many states including Wisconsin, have been adopted by the WRC as institutional policy, and in 1999 were approved by the Health Care Financing Administration ("HCFA"), a federal agency involved in health care financing.

Plaintiffs' experts state that accepted professional standards relating to the use of seclusion and restraint permit the use of such practices only in emergencies involving the imminent risk of harm to the patient or others. They state that according to accepted professional judgment, a patient may not be secluded unless he is engaging in dangerous behavior or escalating to that point and, even then, only for the shortest possible period of time, i.e., until he calms down and demonstrates the capacity for self control. Plaintiffs' experts further state that professional judgment precludes the use of seclusion and restraint as treatment tools unless alternatives such as verbal, environmental or pharmacological intervention are considered or attempted. Additionally, seclusion orders must be for a limited duration, and a patient must be evaluated before being subjected to another order. Finally, according to plaintiffs experts, professional standards do not permit seclusion and restraint to be used as a "deterrent consequence," i.e., punishment. (Tardiff Aff. Ex. 2 at 2.)

Dr. Metzner points out that professional judgment is reflected in WRC Policy # 3.1.8, which provides that "restraint and/or seclusion are available as *tools of last resort* in emergency situations." (Metzner Aff. Ex. 3 at 7) (emphasis in original). The policy further provides that: "[r]estraint and/or seclusion cannot be used: (a) as a deterrent consequence; (b) for the convenience of staff; or (c) merely because of rude or unpleasant behavior by the patient to others." (Metzner Aff.App. IX at 4.) Additionally, the WRC policy defines "deterrent consequence" as "the imposition of a penalty upon a patient . . . as a result of his violation of a unit or facility rule with the intent to deter the patient and/or others from violating such a rule." (*Id.* at 2.) Finally, the policy requires that "[r]estraint and/or seclusion shall be used for the shortest time possible." (*Id.* at 4.)

Plaintiffs' experts state that the SMPs developed for plaintiffs Bennett, Bernal, Addington and West constituted a signifi-

cant departure from accepted professional judgment, practice and standards relating to the use of seclusion and restraint for civilly committed patients. Dr. Tardiff further states that these SMPs represented such a substantial departure from accepted professional judgment, practice and standards as to indicate that the persons who developed or implemented them did not actually base their decisions on such professional judgment.

In his letter of October 16, 2000, Dr. Metzner concurs with Dr. Tardiff's opinion. He states that "professional judgment, as I understand it, was not used to determine the appropriateness or inappropriateness of the use of seclusion and restraints as part of the secure management plans." (Metzner Aff. Ex. 2 at 2.) In a letter of December 29, 2001, Dr. Metzner states that "I do think that professional judgment was exercised by staff during the development of the secure management plans but think that this judgment significantly departed from accepted practices or standards relating to use of seclusion and restraints for civilly committed patients for reasons previously summarized." (Metzner Aff. Ex. 3 at 10.) He goes on to cite examples of staff actions that he believes substantially departed from accepted professional practices and standards. Although Dr. Metzner's second letter does not state that professional judgment was not used at all, taking both of his letters together and construing them in the light most favorable to plaintiffs, as I must, it is reasonable to characterize his view as being similar to that of Dr. Tardiff, i.e., that defendants violated the professional judgment standard established in *Youngberg*.

Plaintiffs' experts discuss in some detail the seclusion placements of the individual plaintiffs. With respect to Addington, Dr. Tardiff states that the SMP developed for him and the seclusions implemented pursu-

ant thereto departed so substantially from accepted professional judgment that they were not actually based on such judgment. Dr. Tardiff states that there was no evidence that Addington posed a threat to himself or others, and that therefore his seclusions were unwarranted.

Concerning Bennett, Dr. Tardiff states that the SMPs developed on December 22, 1997, March 17, 1998, March 31, 1998, and August 11, 1998, and the seclusions implemented pursuant thereto and the period of seclusion commencing on April 23, 1998, represent such a departure from accepted professional judgment that they were not based on such judgment. Dr. Tardiff states that Bennett should not have been kept in seclusion for the lengthy periods authorized by the SMPs but should have been released after he had demonstrated that he was in control of himself. Dr. Metzner agrees, stating that Bennett's lengthy seclusions were not based on emergency need.

Dr. Tardiff reaches a similar conclusion concerning the SMPs developed for Bernal on May 19, 1998, June 22, 1998, and August 4, 1998. He states that these SMPs and the seclusions implemented pursuant thereto represented such a departure from accepted professional judgment that they were not based on such judgment. He further states that Bernal should not have been kept in seclusion for as long as he was and should have been released after he had gotten himself under control.

Finally, Dr. Tardiff states that the SMP developed for West on December 19, 1997 violated the professional judgment standard established in *Youngberg*. Again, he particularly objects to the length of the seclusion and indicates that such seclusion was not justifiable under any accepted concept of treatment.

Drs. Tardiff and Metzner state that plaintiffs' treatment records show that

their seclusion placements lasted long after they had demonstrated appropriate behavior and self-control. Dr. Metzner points out that the notes made by WRC psychological staff concerning Bennett's behavior include the following observations: "a review of the past twelve hours shows Bennett as being quiet and appropriate;" "[n]otes continued to indicate that he remained quiet/calm/resting;" "Mr. Bennett was described as working on wanting to and taking responsibility for his actions and thoughts;" "Mr. Bennett reportedly said that he could not practice his anger management plan while in seclusion;" "described . . . as being very cooperative and appeared to be in a very good mood;" "[s]eclusion status checks generally indicated that Mr. Bennett was quiet/calm/resting;" "[i]t was again noted that he was not an imminent threat to himself for [sic] others;" "Mr. Bennett was described as being polite and appropriate;" "[s]taff reports absence of any difficulties;" "Mr. Bennett was described as being in a pleasant mood and looking forward to going back to a prison." (Metzner Aff. Ex. 3 at 4–6.)

Dr. Tardiff describes how decisions providing for extended periods of seclusion were made.

> On December 21, 1997, several days after he was admitted to WRC, he [Bennett] fought with another patient on the unit. He was placed in seclusion. Despite the log of 15 minute observations describing him as being quiet or talking appropriately to other patients through the door, he was not released from seclusion. Instead, on Monday, December 22, 1997, staff met and developed a Secure Management Plan which anticipated that Mr. Bennett would spend approximately 30 days in seclusion.

(Tardiff Aff. Ex. 2 at 4.)

Pointing to staff notes, he also states that evidence suggesting that plaintiffs could be released from seclusion was ignored: "Pt. Addington's behavior was appropriate . . . No behavior problems noted . . . Pt. was out for rec., quiet . . . took meds no problem . . . He was appropriate/no problems;" "[Bernal was] cooperative and respectful in his interactions with us at this date;" "[Bernal was] quiet, calm, resting or active, appropriate;" "[West] followed all staff directions." (Tardiff Aff. Ex. 2 at 3–6.) Dr. Tardiff states that the fact that plaintiffs were kept in seclusion notwithstanding appropriate behavior is evidence "that the decisions by the psychologists to seclude the plaintiffs were a substantial departure from accepted professional judgment as to demonstrate that the psychologists ordering seclusions did not base their decisions on such judgment." (Id. at 7.)

Plaintiffs' experts also point out that, with respect to at least two seclusion placements, Bennett's, commencing on August 11, and Bernal's, commencing on August 24, the records indicate that the psychologist defendants who ordered seclusion did not base their orders on their professional judgment relating to the patients' proper treatment but on directives from WRC administrators. In both cases, the seclusion placements were continuations of earlier placements ordered by Macht and Canziani. Dr. Metzner states that the SMPs continuing the periods of seclusion were not based on professional judgment because they were only ostensibly based on treatment concerns. Dr. Tardiff makes the same point stating:

> He was placed in seclusion and again was described in 15 minute checks as "quiet, calm, resting or active, appropriate." On August 11, 1998, a meeting was held to discuss his seclusion status. On August 15, 1998, a psychology staff member, Ms. Roblee, wrote a note stating that Mr. Canziani, Director of Security believed that Mr. Bennett should

stay in seclusion. On September 4, 1998, Ms. Echeverria signed a Secure Management Plan [back]dated August 11, 1998. A note on September 5, 1998 by another psychology staff member, Mr. Trippe, stated that "the Security Director has ordered this seclusion." Mr. Bennett remained in seclusion despite an absence of aggression or any other inappropriate behavior for over 2–1/2 months, until October 27, 1998. Mr. Bennett should not have been kept in seclusion for this prolonged period of time. Seclusion may have been indicated followed [sic] the episodes of physical aggression toward others, but he should have been released from seclusion shortly after he calmed down.

(Tardiff Aff. Ex. 2 at 8.)

Indeed, a psychologist's note of September 2, 1998 states that: "Mr. Bennett has been non-problematic on the unit. He interacts appropriately with line staff. Matthew is confined per administrative review. He does not meet the criteria of a clinical placement." (Metzner Aff.App. 3.) Further, defendant Trippe's notes on September 4, 5, 6, 7 and 8, 1998 acknowledge that although Bennett's placement was pursuant to an SMP, it was in fact ordered by the Security Director. For instance, his note of September 6, 1998 reads: "Mr. Bennett does not necessarily meet the standard of imminent danger to self or others, but has been determined to be an ongoing threat to the security of the institution. As a result, this seclusion placement has been ordered by this Security Director at WRC." (Metzner Aff. Ex. 3 at 5.)

The psychologist defendants acknowledge that plaintiffs were secluded when they did not pose a danger to themselves or others. Defendants Trippe, Echeverria, Wojdac, Christian and Enders–Muraski all stated, either in deposition testimony or in opinions recorded on documents relating to

plaintiffs' treatment, that they authorized seclusion for plaintiffs at times when they did not believe that plaintiffs posed an imminent danger of harm to self or others. Further, defendants Schwebke, Trippe and Echeverria, and several non-defendant psychologists acknowledge that the justification for the SMPs was the psychologists' beliefs that plaintiffs needed deterrent consequences and that seclusion was a legitimate means of providing such consequences. With respect to this justification, Dr. Metzner states that "[i]mplementation of such a principle appears to be clearly in conflict with Policy # 3.1.8–P" [the WRC policy which indicates that "restraint and/or seclusion are available as tools of last resort in emergency situations" and that they may not be used "as a deterrent consequence."] (Metzner Aff. Ex. 3 at 9–10.)

### b. Summary of Defendants' Arguments and Evidence

Defendants disagree with plaintiffs' contention that the decisions to subject plaintiffs to lengthy periods of seclusion and restraint were not based on professional judgment, and make a number of arguments in support of their position. First, relying on language in the district court's opinion in *Thielman*, they argue that in order to survive summary judgment plaintiffs must show that the standards identified by their experts are the only standards recognized by professionals, and that plaintiffs failed to meet this burden.

Second, defendants argue that even if the standards identified by plaintiffs represent accepted professional judgment concerning seclusion and restraint of traditional patients under civil commitment, such standards are inapplicable to Chapter 980 patients because they are a different and more difficult type of patient. Defendants present the testimony of three ex-

pert witnesses, Drs. Thomas G. Guthiel, Joseph B. Layde and Gary Maier, in support of this argument. Dr. Guthiel describes Chapter 980 patients as differing from more traditional psychiatric patient groups in that they suffer from "impulse control disorder," which might require longer periods of seclusion and restraint as treatment. (Guthiel Aff. Ex. 6 at 3.) He writes that "the treatment interventions [for patients with "impulse control disorder"] collectively represent almost an effort at *retraining a person's habitual response system* to others and to the environment, rather than a specific intervention directed at a single symptom." (*Id.*) (emphasis in the original). He explains that in treating impulse disorders, "a clear end-point is absent." (*Id.*) This being the case, he writes that the "most rational approach to this problem" involves behavioral restrictions that "are removed or altered in a stepwise fashion, ultimately based on a trial-and error model." (*Id.*)

Defendants' other experts testify similarly. Dr. Layde, for example, describes plaintiff West as being "a very high functioning individual with no psychotic illness and no evident mood disorder, in stark contrast to traditional involuntary mental health patients." (Layde Aff. Ex. 2 at 3.) Describing plaintiff Bernal as being similarly free "from psychosis and major mood disorders," Dr. Layde states that "he was not susceptible to the sort of brief therapeutic use of seclusion and restraint which is typically effective for the traditional involuntary committed mental health patient." (*Id.* at 6.) Dr. Maier too speaks of Chapter 980 patients as "non-traditional." (Maier Aff. Ex. 4 at 4.)

Defendants' experts use the concept of a non-traditional patient to justify extended periods of seclusion, which they acknowledge would violate accepted professional judgment if applied to "traditional" mental health patients. For example, Dr. Maier writes:

> In the traditional mental health context the phrase "imminent emergency" refers to the likelihood of a sudden aggressive act that might be committed by a traditional mental patient, one with a diagnosis of schizophrenia or affective disorder. At times these patients require seclusion and/or restraint in order to prevent them from harming themselves or others. During the period of seclusion and restraint they are given an opportunity to regain control of themselves while these external policies are in force. Patients Rights, JCAHO standards and HCFA guidelines have had a positive impact on determining the minimum time necessary for an agitated traditional mental patient to regain control of themselves when properly treated and in need of seclusion and restraint. Recently it has been determined that these patients are able to regain self-control in minutes, hours, or in some cases, days.

(Maier Aff. Ex. 4 at 4.)

Dr. Maier calls for a shifting definition of "imminent emergency" according to the type and treatability of the patient. (*Id.*) ("The 'imminent emergency' varies with the patient's mental status and our ability to treat the patient's illness.") He states that for the "traditional" mental health patient

> it is easy to see a relationship between the length of seclusion and the resolution of the acuity of the illness. By comparison there does not appear to be a relationship between the length of seclusion and "improvement" or safety for APD's [those with Antisocial Personality Disorder, which he identifies as the diagnoses of plaintiffs]. The length of the use of emergency seclusion in a Secure Management Plan will vary with the desire of the APD to decide that he no

longer wants to be confined. And time is required to make the assessment. Not minutes or hours, but in some circumstances, days, weeks or months.

(*Id.* at 5.)

Defendants' third argument in support of their contention that the lengthy seclusions of plaintiffs were not inconsistent with professional judgment is that the SMPs were created in a manner that, from a procedural standpoint, was professional. For example, Dr. Guthiel writes that "[h]istorically-validated elements of professional judgment in the present context include, but are not limited to, assessment of the patient; clear identification of target behaviors; clinically-based, data-driven responses suited to the situation; use of team consultation; and identification of goals and end-points of treatment." (Guthiel Aff. Ex. 6 at 2.) Dr. Guthiel then finds these characteristics to be present in the SMPs, writing that "[t]he Secure Management Plans for the four plaintiffs reveal reliable indicia of the use of professional judgment." (*Id.* at 9.) Defendants' other experts also emphasize procedural characteristics of the SMPs such as the fact that treatment teams were used, conditions were documented and plans, with multiple phases, were written out in detail. (*See* Layde Aff. Ex. 2 at 3–7; Maier Aff. Ex. 4 at 7–12.) Dr. Layde concludes: "As evidenced by those common elements of the plans, it is clear that the drawing up and carrying out of the Secure Management Plans referred to above represent the exercise of professional judgment by the WRC staff in responding to this difficult patient population." (*Id.* at 7.)

Based on the foregoing arguments, defendants' experts conclude that the seclusion placements imposed on plaintiffs were based on professional judgment. Dr. Maier summarizes his conclusion as follows:

It is also my opinion to a reasonable degree of medical certainty that the treatment teams exercised professional judgement within the meaning of Youngberg v. Romeo because they made an assessment of the circumstances related to the emergency, then formulated a plan that defined attainable behavioral goals, that were time-limited, were frequently evaluated and after analysis were modified in response to the patients['] progress. The plans evolve in graduated phases clearly designed to provide a patient feedback about their progress.

(Maier Aff. Ex. 4 at 8.)

### c. Discussion

█ Under *Youngberg*, the treatment decisions made by the psychologist-defendants are presumptively valid and entitled to deference. 457 U.S. at 323, 102 S.Ct. 2452. However, professionals will be found to have violated substantive due process when a treatment decision "is such a substantial departure from accepted professional judgment practice, or standards as to demonstrate that the person responsible actually did not base his decision on such a judgment." *Id.* The question, then, is taking the evidence in the light most favorable to plaintiffs, whether a reasonable jury could find the evidence sufficient to overcome the presumptive validity of the psychologists decisions and to justify a finding that defendants violated the professional judgment standard. I conclude that there is sufficient evidence in the record to permit a reasonable jury to reach such conclusions, and that therefore psychologist-defendants' summary judgment motion with respect to the substantive due process issue must be denied.

I reach this conclusion for a number of reasons. First, although *Youngberg* recognized that the exercise of professional judgment is a constitutionally acceptable basis for the administration of clinical treatment in certain circumstances, it does

not accept entirely unconstrained professional discretion. Rather, *Youngberg* articulated a substantive standard that defines the limits within which professionals are authorized to exercise professional judgment. The standard requires that the treatment provider ensure that the patient remains safe from bodily injury and free from undue restraint. *Id.* at 319, 102 S.Ct. 2452. The treatment must be "reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints." *Id.* at 322, 102 S.Ct. 2452. In defining the scope of such interests, the Court stated that the plaintiff was entitled to "reasonably nonrestrictive confinement conditions." *Id.* at 324, 102 S.Ct. 2452.

Thus, *Youngberg* acknowledged that some calibration of restrictivity of treatment is essential in any case construing substantive treatment rights. Michael L. Perlin, *Mental Disability Law: Civil and Criminal* § 3A–9.5 (1999). Perlin points out that the phrase, "reasonably nonrestrictive confinement conditions" resembled the concept of "least drastic means" that the Court had applied previously in different factual contexts. *Id.* n. 784. Other commentators make a similar point. *See* Robert Schopp, Mario J. Scalora and Marc Pearce, *Expert Testimony and Professional Judgment, Psychological Expertise and Commitment as a Sexual Predator After Hendricks,* 5 Psychol. Pub. Pol. & Law 120, 158–59 (Mar.1999):

> Just as *Harper*'s [*Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)] substantive standard limits professional judgment to the range of treatment modalities appropriate to the concerns identified in that substantive standard, *Romeo*'s substantive standard specifies the parameters of professional judgment by requiring that professionals exercise that judgment for the purpose of selecting treatment modalities intended to protect the Constitu-

tional liberty interests in reducing bodily injury and undue restraint.

In *Youngberg*, then, the Court established substantive constitutional criteria within the context of which clinical professionals must exercise professional judgment. *Id.* at 159. If the professional judgment standard was not constrained by the constitutional requirement that it be exercised consistent with preventing undue restraint, professional judgment would improperly supercede judicial analysis in determining whether constitutional rights were violated. Constitutional rights transcend professional judgment, and indeed in cases such as the present one, where the plaintiff challenges the constitutionality of a state action that constrains or limits his rights, the judgment of a professional constitutes the alleged abuse of power. To decide that such constitutional values as autonomy, self-determination and freedom from intrusion are never violated as long as a professional exercises judgment in limiting or eliminating them would substitute professional values for constitutional values and result in an abdication by the courts of their obligation to protect individual rights. Susan Stefan, *Leaving Civil Rights to the "Experts": From Deference to Abdication under the Professional Judgment Standard,* 107 Yale L.J. 639, 668 (Dec.1992).

Cases decided since *Youngberg* support the notion that the professional judgment standard is constrained by the constitutional requirement that the treatment be reasonable in light of a patient's liberty interests in safety and freedom from unreasonable restraint. *See Wells v. Franzen,* 777 F.2d 1258, 1261–62 (7th Cir.1985) ("[I]t is the duty of a court to ensure that professional judgment in fact was exercised"); *see also Estate of Porter by Nelson,* 36 F.3d 684, 688 (7th Cir.1994), *abrogated on different grounds by Lapides v.*

*Bd. of Regents of Univ. Sys. of Georgia,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002) (where the Seventh Circuit, in a failure to protect case involving the alleged murder of a mental patient by another mental patient, compared the professional judgment standard to recklessness or gross negligence); *Thomas S. by Brooks v. Flaherty,* 902 F.2d 250, 252 (4th Cir.1990) ("The decisions of the treating professionals are not conclusive, however."). And in a recent right to refuse treatment case, the Supreme Court used "least restrictive alternative" language rather than the professional judgment standard. *Riggins v. Nevada,* 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992).

Second, aside from the question of the precise contours of the professional judgment standard, plaintiffs present a great deal of evidence that the extended seclusion placements to which they were subjected so substantially departed from accepted professional standards as to indicate that they were not actually based on such standards. Plaintiffs present the testimony of two experts both of whom opine that plaintiffs' treatment was not consistent with accepted professional judgment relating to the treatment of patients under civil commitment. Both of plaintiffs' experts state that accepted professional judgment does not permit civilly committed mental patients to be secluded, as plaintiffs were, for weeks and months at a time in the absence of evidence that such patients are imminently dangerous to themselves or others. Plaintiffs' experts further agree that, even if some of the decisions to seclude plaintiffs may have been justified initially, it was contrary to accepted professional judgment to keep plaintiffs in seclusion for such extended periods of time.

The type of expert testimony that plaintiffs present on the question of whether the psychologist-defendants departed from accepted professional standards is precisely the type of testimony contemplated by *Youngberg,* 457 U.S. at 323 n. 31, 102 S.Ct. 2452; *see also Perlin, supra,* § 3A–9.4 ("It is clear that the Court contemplated the admission of expert testimony on the question of whether or not the defendants' decisions were a substantial departure from such judgment."). Courts typically rely on experts to determine whether professional judgment was exercised. *See, e.g., Thomas S. by Brooks,* 902 F.2d at 252 (where the court determined what accepted professional standards were concerning the use of restraint based in part on the testimony of the parties' experts); *see also Subacz v. Sellars,* No. 96–CV–6411, 1998 WL 720822, at *10 (E.D.Pa. Sept.21, 1998) ("The reports of Drs. Gur and Sadoff regarding Mrs. Subacz are sufficient to defeat this motion. Dr. Gur ... was of the opinion that 'minimal standards of practice and care had not been applied' ... Dr. Sadoff also opines that 'the staff of Wernersville State Hospital deviated from accepted professional judgment, practice and standards of case [sic] in their treatment of Merilee Subacz.' ").

Moreover, plaintiffs' experts present more than their own opinions. They present considerable evidence that their view of what accepted professional judgment is is widely shared among treating professionals. They point out that the standards that they identify as accepted professional judgment were adopted by the American Psychiatric Association Task Force on the proper use of seclusion and restraint as treatment tools. The American Psychiatric Association Task Force, however, is not the only professional body to have adopted the standards identified by Tardiff and Metzner. The Joint Commission on Accreditation of Healthcare Organizations (JCAHO) has adopted similar standards. JCAHO sets specific time limits on the use

of seclusion as a treatment tool. For adults the limit is four hours, with the potential for continuing the order for another four hour period up to a maximum of twenty-four hours. Joint Commission on Accreditation of Healthcare Organizations, *1997–1998 Manual for Behavioral Health Care* 285–86 (1996). Plaintiffs' experts also point out that the standards that they identify as accepted professional judgment have been adopted by many state legislatures, Wisconsin's included, by HCFA and by the WRC itself. The seclusion placements imposed on plaintiffs substantially departed from the standards adopted by all of the foregoing organizations and institutions.

That the seclusion placements may have violated standards promulgated by psychiatric organizations, rights established by state law and the policies of the treating institution does not itself establish a constitutional violation. Nevertheless, a substantial departure from such standards may be evidence of the violation of the professional judgment rule. *Wells,* 777 F.2d at 1262 ("[T]he due process standard [for using restraints] is based on norms set by the mental health professionals"); *id.* at 1264 ("[T]he [Illinois] regulation may provide some evidence of the existing professional norms"); *see also Thomas S. by Brooks,* 902 F.2d at 252 ("[T]he [district] court identified the accepted professional standards regarding . . . restraint . . . based on the Secretary's written policies"); Christopher L. Coffin, *Case Law and Clinical Considerations Involving Physical Restraint and Seclusion for Institutionalized Persons With Mental Disabilities,* 23 Mental & Physical Disability L. Rep. 597, 599 (1999) ("Many states, by statute or regulation, dictate procedures that mental health clinicians must follow when ordering physical controls and monitoring their use. In states that do not outline such procedures, clinicians should observe standards that have been published by profes-

sional mental disability organizations [citing the APA Task Force Report] or the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).").

In contrast to plaintiffs' experts, defendants' experts do not present evidence that their views regarding the propriety of plaintiffs' treatment are reflected in standards promulgated by professional organizations or governmental bodies. The absence of such evidence weakens defendants' argument that the extended seclusion placements at issue were consistent with accepted professional judgment.

Third, with respect to at least two of the seclusion placements under consideration, one involving Bennett and one involving Bernal, plaintiffs present evidence that, although purportedly based on clinical concerns, such placements were in fact ordered by WRC administrators. The evidence suggests that the psychologist-defendants who ordered the treatment did so at the behest of administrators. Decisions of treatment professionals that were not actually based on the treatment needs of patients but rather served as conduits for the decisions of non-professional administrators would be unlikely to satisfy the professional judgment standard.

Fourth, the seclusion placements imposed on plaintiffs were more onerous than placements that courts have already found violative of the professional judgment standard. *See, e.g., Thomas S. by Brooks v. Flaherty,* 699 F.Supp. 1178, 1190 (W.D.N.C.1988), *aff'd, Thomas S. by Brooks v. Flaherty,* 902 F.2d 250 (4th Cir. 1990). There the court found that periods of seclusion of approximately six hours per day for eleven out of fourteen days constituted a substantial departure from professional standards. *Id.* The court stated that "the . . . constitutional liberty interest in avoiding bodily restraint encompasses . . . freedom from solitary confinement ex-

cept in emergencies." *Id.; see also King v. Greenblatt,* 149 F.3d 9, 21–22 (1st Cir. 1998) (where court upheld the use of seclusion as punishment and authorized periods of seclusion lasting up to thirty days but only for patients who had committed extremely serious offenses such as murder and rape after they had been institutionalized as patients. For patients who had committed offenses such as assault or drug law violations, even with aggravating circumstances, the maximum period of seclusion permitted was five days). By contrast, in the present case, plaintiffs were secluded for periods lasting weeks and months, and in 1998 two of the plaintiffs spent over one hundred days in seclusion.

Finally, it is reasonable to infer that the reason for the WRC's policy that plaintiffs were allowed to leave their seclusion cells for one or two hours on weekdays but not at all on weekends was that less staff was available on weekends. Although a minor point in the scheme of things, courts have been hostile to institutional policies whose only underlying justification is administrative or staff convenience. Susan Stefan, *What Constitutes Departure From Professional Judgment,* 17 Mental & Physical Disability L. Rep. 207, 210 (Mar./Apr. 1993); *see also, Soc'y for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1247 (2d Cir.1984) (where court found liability under professional judgment standard when residents of an institution were locked into wheelchairs simply because it was faster to move them in that fashion); *McCartney v. Barg,* 643 F.Supp. 1181, 1188 (N.D.Ohio 1986) (where the court explicitly balanced administrative convenience with professional judgment); *Ihler v. Chisholm,* 15 Mental & Physical Disability L. Rep. 572 (Mont.Dist.Ct. Sept. 26, 1991) (where court found liability when patients were placed in seclusion during the lunch hour because all available staff were escorting other patients to the cafeteria).

Thus, plaintiffs present a strong case against granting defendants' motion for summary judgment. Defendants' response is insufficiently persuasive to compel a different result.

Defendants argue first that the district court's opinion in *Thielman* requires that plaintiffs prove that there is only one professionally accepted treatment method. However, defendants take the *Thielman* court's language out of the case's context and thereby overstate plaintiffs' burden under *Youngberg.* *Youngberg* does not require that plaintiffs show that there is only one proper way of treating a condition. In all probability, a range of treatment options will be considered professionally acceptable in many situations. Rather, *Youngberg* requires that, whatever the contours of professional standards, plaintiffs must show that the challenged decisions fall outside of them. *Thielman* involved a challenge to the WRC's policy relating to the use of security precautions when transporting patients. However, the plaintiff failed to present persuasive evidence that defendants departed from professional standards. In contrast, in the present case plaintiffs present a great deal of evidence on this issue.

Nor am I persuaded by defendants' argument that the standards identified by plaintiffs (which defendants appear to concede represent accepted professional standards for the treatment of most mental patients) are inapplicable because plaintiffs are non-traditional, i.e., difficult patients. Defendants present no evidence of the existence of a different set of professional standards applicable to non-traditional patients. Further, in § 51.61 the Wisconsin legislature granted patients committed under Chapter 980 the same rights as other patients under civil commitment, and the WRC policies do not make a distinction of the type suggested by defendants. Defen-

dants' argument is also weakened by their failure to clearly define the characteristics that allegedly make plaintiffs non-traditional, and to specify what limitations apply to the use of seclusion and restraint in treating such patients.

Finally, the psychologist-defendants' arguments that their decisions to impose extended seclusion placements on plaintiffs were arrived at in a professional manner are also not strong enough to justify granting summary judgment. The fact that the treatment decisions were "data driven," that patient goals were identified and that "team consultation" was used (Guthiel Aff. Ex. 6 at 2), is undoubtedly evidence in defendants' favor. However, a valid process does not necessarily ensure that the substance of the decision reached was consistent with accepted professional judgment. Defendants' experts say much less about the content of defendants' decisions, i.e., the imposition of extended periods of seclusion and restraint, than they do about the decision-making process.

Thus, for the foregoing reasons, I conclude that plaintiffs present sufficient evidence from which a reasonable jury could find that, notwithstanding the presumption of validity that attaches to the psychologist-defendants' treatment decisions, such decisions were not based on professional judgment and therefore violated plaintiffs' substantive due process rights. Defendants' arguments to the contrary are not sufficiently persuasive to overcome such evidence. Therefore, defendants' motions for summary judgment with respect to plaintiffs' substantive due process claims regarding treatment-related seclusion placements will be denied.

## VIII. QUALIFIED IMMUNITY

■ The psychologist-defendants argue that summary judgment must be granted based on qualified immunity. Under the doctrine of qualified immunity

"government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The test for determining whether public official defendants are entitled to qualified immunity is an objective one. *See id.; Triad Assocs., Inc. v. Robinson,* 10 F.3d 492, 496 (7th Cir.1993). In *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court explained the methodology to be used in addressing the issue of qualified immunity. The initial inquiry is whether, taking the facts in the light most favorable to the party asserting the injury, the facts alleged show that a constitutional right was violated. *Id.* at 201, 121 S.Ct. 2151. In the present case I have already determined that a reasonable jury could conclude that the right to substantive due process was violated.

The second sequential step is to ask whether the right was clearly established at the time of the alleged violation. *Id.* In the present case, where defendants are treatment professionals and the question is whether they exercised professional judgment, the relevant inquiry in determining whether the right was clearly established is whether it would have been clear to a reasonable professional that his or her conduct was unlawful in the situation defendants confronted. *Id.* at 202, 121 S.Ct. 2151. The burden of establishing the existence of a clearly established constitutional right is on plaintiffs, and it is a heavy one because qualified immunity is designed to shield from civil liability " 'all but the plainly incompetent or those who knowingly violate the law.' " *Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989) (quoting *Mal-*

*ley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right at the time of the incident. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In determining whether the contours of the right are sufficiently clear, I look first to case law on point or in closely analogous areas to see if "reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly." *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985). In determining whether a right is clearly established, I look at decisions at all levels of the federal courts and those of state courts. *See Burgess v. Lowery,* 201 F.3d 942, 944–45 (7th Cir.2000).

In the present case the question of whether defendants were on notice that their conduct was unlawful may depend on the resolution of factual issues that are presently disputed; nevertheless, taking the facts in the light most favorable to plaintiffs, I find that reasonable professionals would have known that their treatment decisions imposing extended periods of seclusion and restraint on plaintiffs so substantially departed from accepted professional standards as to not have been based on such standards. *Youngberg* clearly established the professional judgment standard, and the Seventh Circuit and other courts had made clear that the standards adopted by professional organizations and governmental bodies were relevant to the question of what constitutes accepted professional judgment. *Wells,* 777 F.2d at 1262, 1264 (stating that due process standard was based on norms set by mental health professionals, and that state regulations constituted evidence of such norms); *see also Thomas S.,* 902 F.2d

at 252 (approving determination of professional norms based on written state policies).

Moreover, reasonable professionals would have been aware that under accepted professional standards governing the treatment of patients involuntarily committed to state institutions, seclusion and restraint may be used only when necessary to protect the patient or others and only for short periods of time. These standards were clearly established in case law, *see Thomas S.,* 699 F.Supp. at 1200 (holding that plaintiffs' "constitutional liberty interest in avoiding bodily restraint encompass[ed] ... freedom from solitary confinement except in emergencies"), *aff'd,* 902 F.2d at 252 (finding that the district court had "ample evidence" supporting its finding that the defendant substantially departed from accepted professional standards regarding seclusion), in a report by the American Psychiatric Association Task Force, in guidelines promulgated by JCAHO, in state law and in the policies governing the WRC. Plaintiffs present sufficient evidence to show that reasonable treatment providers would have been on notice that placing patients in seclusion for weeks and months on end for periods of twenty-two to twenty-four hours per day was not a professionally accepted mode of treatment. Thus, defendants' motion to dismiss based on qualified immunity must be denied.

## IX. MOTION TO SUPPLEMENT

On October 25, 2002, plaintiffs moved to supplement the Third Amended Complaint to (1) update their addresses to reflect that West, Bennett, Thiel and Addington have been transferred to Sand Ridge; and (2) to add as a defendant Steven Watters, the director of Sand Ridge, in his official capacity.

Fed.R.Civ.P. 15(d) states: "Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." District courts have broad discretion to grant or deny motions to supplement. *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th Cir.1985). In ruling on a motion to amend or supplement, I must consider whether granting the motion will protract the litigation, complicate the defense, or burden the defendant. *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir.1996); *see also Otis Clapp*, 754 F.2d at 743 (holding that district court did not abuse its discretion in denying a motion to supplement on the grounds that it would raise new issues, require new discovery and prolong the litigation).

Of course I will permit the plaintiffs to update their addresses. However, I will deny their request to add Steven Watters as a defendant. Adding Watters to the case would add new claims to an already complicated case, require substantial additional discovery, unnecessarily burden defendants and protract the litigation. Sand Ridge is a separate entity from WRC and has separate policies. If Watters was added as a defendant, these policies would have to be explored. This would burden both defendants and the court inasmuch as complicated summary judgment motions have been fully briefed for months. Simply stated, it is too late in the case to permit the amendment.

### ORDER

**THEREFORE, IT IS ORDERED** that defendants' motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART** as follows:

Defendants' motions for summary judgment with respect to Counts II, III, V and VI are **GRANTED**.

Defendants' motions for summary judgment with respect to plaintiffs' requests for injunctive relief are **GRANTED**.

Defendants' motions for summary judgment with respect to plaintiffs' official capacity claims are **GRANTED**.

Defendants' motions for summary judgment with respect to plaintiffs' Count I claims pertaining to defendants Macht, Bartow, Canziani and Collier are **GRANTED**, but defendants' motions with respect to plaintiffs' individual capacity claims for money damages against defendants Schwebke, Echeverria, Wojdac, Trippe, Christian and Enders–Muraski are **DENIED**.

Defendants' motions for summary judgment with respect to plaintiffs' Count IV claims are granted as to defendants Bartow and Canziani, but as to the following individual capacity claims for money damages, the motions are **DENIED**:

 a) West's claims noticed March 12 against Collier, Schwebke and Macht;

 b) Addington's claims noticed January 19, 2000 against Trippe;

 c) Bernal's claims noticed April 9, 1999 against Schwebke, Trippe, Wojdac, Christian, Echeverria and Enders–Muraski; and

 d) Bennett's claims noticed on June 12, 1998, June 30, 1998, and April 27, 1999 against collectively Wojdac, Schwebke, Trippe, Christian, Echeverria, and Enders–Muraski.

**IT IS FURTHER ORDERED** that plaintiffs' motion to supplement is **GRANTED IN PART** insofar as it requests that plaintiffs' addresses be updated, but **DENIED** insofar as it seeks to add Steven Watters as a defendant.

FINALLY, IT IS ORDERED that a telephone status conference will be held on December 16, 2002 at 2:00 p.m. The court will initiate the call.